1
2
3
4
5
6
7
8

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   BRANDON EVERETTE GROVES, ) No. C 03-4316 MMC (PR)
 )
10    Petitioner, ) **ORDER DENYING PETITION**
 ) **FOR WRIT OF HABEAS**
11 v. ) **CORPUS**
 )
12 CHERYL PLILER, Warden, )
 )
13    Respondent. )
 )
14 _____ )

15   On September 23, 2003, petitioner Brandon Everette Groves, a California prisoner

16   proceeding pro se, filed the above-titled petition for a writ of habeas corpus pursuant to 28

17   U.S.C. § 2254.  On November 4, 2003, the Court ordered respondent to show cause why the

18   petition should not be granted based on petitioner's cognizable claims for relief.  On

19   January 5, 2004, respondent filed an answer accompanied by a memorandum and exhibits.

20   On March 10, 2004, petitioner filed a traverse.

21          **PROCEDURAL BACKGROUND**

22   In June 1999, petitioner was charged in San Mateo County Superior Court with

23   kidnapping for the purpose of committing oral copulation (Count 1), forcible oral copulation

24   (Counts 2 and 3), kidnapping during the commission of a carjacking (Count 4) and

25   carjacking (Count 5).  In August 1999, petitioner filed a motion to substitute counsel

26   pursuant to <u>People v. Marsden</u>, 2 Cal. 3d 118 (1970).  After hearing from petitioner and his

27   attorney, the trial court denied the motion.  On January 3, 2000, the first day of trial,

28

1

1   petitioner filed his second <u>Marsden</u> motion, which, after a hearing, the trial court likewise

2   denied.  On January 14, 2000, the jury found petitioner guilty of both counts of forcible oral

3   copulation (Counts 2 and 3), and of carjacking (Count 5).  The jury found petitioner not

4   guilty of kidnapping to commit oral copulation (Count 1), and instead found him guilty of the

5   lesser-included offense of simple kidnapping.  With respect to the charge of kidnapping

6   during the commission of a carjacking (Count 4), the jury found petitioner not guilty, and

7   instead found him guilty of the two lesser-included offenses of simple kidnapping and

8   carjacking.  On March 16, 2000, the trial court sentenced petitioner to fifty-nine years to life

9   in prison.

10          The California Court of Appeal affirmed petitioner's conviction, but reversed the

11   sentence and remanded for re-sentencing.[1]  The California Supreme Court denied the petition

12   for review.  Thereafter, petitioner filed unsuccessful habeas petitions in the California Court

13   of Appeal and the California Supreme Court.  On September 23, 2003, petitioner filed a

14   federal habeas petition in this Court.

15                                  **FACTUAL BACKGROUND**

16          The following factual account is set forth in the California Court of Appeal opinion.

17          Ramsey D. finished work about 11:30 p.m. on the night of April 26-27,
     1999.  Shortly before midnight, she met two coworkers at a Palo Alto pub for a
18   drink.  Each of them had one or two beers.  After less than an hour, Ramsey
     drove off in her black Ford Explorer with one of her coworkers, Ed Horrigan.
19   Ten minutes later, she dropped him off at his East Palo Alto home.  It was
     about 1:00 a.m. when Ed gave her directions to the freeway and watched her
20   drive away.
          Ramsey drove toward Highway 101, intending to head south.  In a
21   deserted area, a man -- later identified as appellant Brandon Groves -- waved at
     her to stop.  When she stopped and rolled her window partway down, he told
22   her that he was out of gas and asked for help.  She handed him the few dollars
     she had and he asked her for a ride to a gas station.  Ramsey let him into her car
23   and drove toward where Groves indicated that a gas station might be located,
     listening to him talk as she did.
24          Groves directed her to pull over near an apartment building where he
     said a friend of his lived.  He asked her if she was a police officer -- when she

25

26   _____
          [1] On March 11, 2002, at petitioner's re-sentencing hearing, the trial court sentenced petitioner
27   to forty-three years to life in prison.  The Court of Appeal affirmed that sentence on March 20, 2003.
     None of the claims raised in the instant habeas petition relate to petitioner's sentence.
28
                                              2

denied this, he challenged her to prove that what she said was true. She could not prove it, she told him. At this point, she sensed that he wanted more than gas for his car. Ramsey did not want him to be in her car any longer. She was frightened that he would not leave her and that something bad was going to happen. He asked if she wanted to party with him -- she thought he meant did she want to go up to his friend's apartment. Ramsey said no. She felt uncomfortable and wanted to take him to a gas station or to his car. Ramsey thought that if she got to a gas station, an attendant would be there, so it would be safe to force Groves to get out of her car. She went where he directed her, but she was lost and she could not find an open gas station.

She tried to remain calm, but Ramsey was terrified. Groves seemed to be friendly one minute, then become angry without warning. She feared any confrontation with him, because she did not want to make him angry or act in a manner that might prompt him to hurt her. She thought as long as she did not refuse him, eventually, he would get out of the vehicle or she would drive to find someone to help her. She felt that she had no choice but to follow his directions. The area Ramsey drove around in was mostly deserted, but she saw two girls when Groves directed her [to] a parking lot. One of them spoke to Ramsey, but the girl did not seem to her to be the kind of person who would help, so when Groves and the girl seemed to quarrel, Ramsey backed the car out and drove off again. Other people Ramsey saw nearby seemed to her to be associated with the girls -- she did not think they would be friendly to her.

As they drove on, a car appeared behind them. Groves became very nervous, almost panicky, apparently thinking that the car was following them. He told her to drive very slowly and to do exactly as he said. When the car behind them turned away, Groves was very upset. He told Ramsey that he had just gotten out of jail and had a lot of money with him. He told her that when he asked her to take him to a gas station, he was speaking in code -- suggesting that she was not the person he thought she was. It made no sense to Ramsey.

Groves directed her to a cul-de-sac which was very deserted -- no houses, no people, no cars around. He directed her to pull over and turn off the car. Ramsey said she did not want to turn the car off, saying she felt safer with the car on. He repeated his command to turn off the car, but now his voice was harsher. She did as he asked, but within a minute, she turned the car back on and began to drive out of the cul-de-sac. He was really angry with her now. He directed her to another location, which turned out to be a second cul-de-sac, and again told her to turn off the car. When she did so, Groves grabbed for the car keys, wrestled them away from Ramsey and tossed them onto the dashboard. He said that he did not want to steal her car.

Again, Groves accused Ramsey of being a police officer. He told her that she had to touch him to prove that she was not, gesturing to his crotch. She thought he would calm down if he believed that she was not a police officer, so she placed her hand on the crotch of his pants for a second, then removed her hand. Instead, he said "Now you are going to take care of my business."

Ramsey was not certain what he meant, but she grabbed the car keys from the dashboard and tried to start the car. Groves took the keys from her, angrily repeating his statement that she was to "take care of my business." He told her that touching him was not good enough -- "You're going to have to suck my . . . dick." Ramsey tried to reason with him, explaining that she did not do that with people she did not know, only with people she cared about. He denied having ordered her to orally copulate him, then gestured again to his crotch and ordered her to "take care of my business." Groves was really angry

3

then and Ramsey did not feel that she had any choice. She did not think that she could get away, so she did as he ordered. She undid his belt and his pants, removed his penis from his underwear and took it about two inches into her mouth for a few seconds. Ramsey thought she was going to vomit, so she stopped.

Ramsey thought she might be able to distract Groves. She asked him his name -- he said it was Junior, then said it was Brad Johnson. Groves kissed her and she backed away from him. He asked her if she had AIDS and told her that he did not, suggesting that they might have sex later. Ramsey turned on the overhead light and said: " 'Will you please look me in the eye and tell me you are not going to hurt me?' " That annoyed him. Groves turned off the light and said " 'Get back to what you are doing.' " Ramsey again took his penis into her mouth for a few seconds and again found that she could not do it. She started feeling around for her keys, which he tossed onto the dashboard.

Ramsey grabbed the keys and opened the vehicle door to escape. Groves grabbed her clothing, restraining her from leaving the vehicle. They struggled and both fell out of the vehicle. She screamed for help; Groves was on top of her on the ground and put his hand over her mouth. Ramsey still had her keys and Groves tried to recover them and to keep her quiet. He threatened to hit her if she did not remain silent. When he took his hand off of her mouth, she screamed again, struggling with him. When Groves used both hands to pry open her hand so he could get her keys, she managed to get out from under him and rolled away. She began to run, hearing him start the vehicle and back out of the cul-de-sac.

Ramsey sought help at nearby houses, crying for help and asking for the police. About 2:30 a.m., an East Palo Alto police officer working in his beat responded to a dispatch call. He drove his police car with lights and sirens on to a location a half-mile away on Garden Street, a known high-drug area. A woman -- screaming and hysterical, who appeared to have been crying -- ran toward his car. Ramsey told the officer that her Explorer had been taken on Garden Street and that she had been assaulted. She gave the officer a description of the person who took her vehicle. He also noted a name that the suspect had given Ramsey.

She had abrasions on her right hand -- her knuckles were bleeding -- and the left side of her face was somewhat red and her eyes were red from crying. The officer checked Ramsey for signs that she was under the influence of drugs or alcohol, but he observed none. He sent out a description of her vehicle and the man who took it. Ramsey declined an offer of an ambulance to take her to a doctor.

On April 30, 1999, the Explorer was found in a San Jose parking lot. Local police learned that it had been reported stolen and that it had been involved in a carjacking. An officer observed the empty vehicle until Groves got into it and began to drive away. Five police cars blocked Groves's exit. As many as six police officers drew their weapons and pointed them at him. Groves was ordered to turn off the vehicle, throw the keys out of it and get out of the vehicle himself. Rather than do any of these things, he took a cigarette and lit it. Eventually, he got out of the car, but instead of lying on the ground as he was ordered to do, he approached an officer pointing an assault rifle at him and yelled "You want to kill me?" Groves was handcuffed and arrested. He was held by San Jose police until San Mateo County officials could interview him.

The car was impounded. A suitcase and some small duffel bags were inside it. San Mateo County officials searched the vehicle and found mail

4

1

addressed to Groves inside it.  Men's clothing was also found in the Explorer, but no contraband.

2

. . .

3

Ramsey testified that she was twenty-two years old in January 2000 at the time of trial.  Groves did not appear to be armed, she told the jury, and he made no direct threat against her.  She did not see an open gas station that night and did not see a patrol car until after she fled from Groves.  She had no more alcohol than the beer she drank earlier that evening and did not use any drugs.  A criminologist testified that a urine test Ramsey provided did not show any evidence of narcotics.  In his defense, Groves put on evidence that at least two gas stations open 24 hours a day were located in the neighborhood that Ramsey described driving around in.

4

5

6

7

People v. Groves, No. A090570, slip op. at 1-5 (Cal. Ct. App. Oct. 26, 2001) (hereinafter

8

"Slip Op.") (attached as Resp.'s Ex. H).

9

**DISCUSSION**

10

A.    Standard of Review

11

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person

12

in custody pursuant to the judgment of a State court only on the ground that he is in custody

13

in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a);

14

Rose v. Hodges, 423 U.S. 19, 21 (1975).

15

A district court may not grant a petition challenging a state conviction or sentence on

16

the basis of a claim that was reviewed on the merits in state court unless the state court's

17

adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an

18

unreasonable application of, clearly established Federal law, as determined by the Supreme

19

Court of the United States; or (2) resulted in a decision that was based on an unreasonable

20

determination of the facts in light of the evidence presented in the State court proceeding." 28

21

U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412-13 (2000).  Habeas relief is

22

warranted only if the constitutional error at issue had a "'substantial and injurious effect or

23

influence in determining the jury's verdict.'"  Penry v. Johnson, 532 U.S. 782, 796 (2001)

24

(quoting Brecht v. Abrahamson, 507 U.S. 619, 638 (1993)).  A federal court must presume

25

the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1).

26

Here, all but one of petitioner's claims, specifically, the fourth claim discussed below,

27

were previously raised only in state habeas petitions, all of which petitions were summarily

28

5

1  denied.  Consequently, with the exception of the fourth claim, because the state courts gave

2  no reasoned explanation for their decisions, this Court will conduct "an independent review

3  of the record" to determine whether the state court's decision was an unreasonable

4  application of clearly established federal law.  See Himes v. Thompson, 336 F. 3d 848, 853

5  (9th Cir. 2003); see also  Fisher v. Roe, 263 F.3d 906, 914 (9th Cir. 2001). ("[W]hile we are

6  not required to defer to a state court's decision when that court gives us nothing to defer to,

7  we must still focus primarily on Supreme Court cases in deciding whether the state court's

8  resolution of the case constituted an unreasonable application of clearly established federal

9  law.")

10  B.     Legal Claims

11          1.     Ineffective Assistance of Counsel

12          Petitioner contends he was denied effective assistance of counsel because his counsel

13  waived the preliminary hearing, and failed to file motions for discovery, to suppress

14  evidence, and to dismiss charges against him.  Petitioner argues that this conduct amounted

15  to deficient performance by counsel, and that such deficient performance was prejudicial

16  because he was tried on charges that should not have been brought against him.

17          A claim of ineffective assistance of counsel is cognizable as a claim of denial of the

18  Sixth Amendment right to counsel, which guarantees not only assistance, but effective

19  assistance of counsel.  Strickland v. Washington, 466 U.S. 668, 686 (1984).  The benchmark

20  for judging any claim of ineffectiveness must be whether counsel's conduct so undermined

21  the proper functioning of the adversarial process that the trial cannot be relied upon as having

22  produced a just result.  Id.

23          In order to prevail on a Sixth Amendment claim of ineffectiveness, petitioner must

24  establish his attorney's performance was deficient, specifically, that it fell below an

25  "objective standard of reasonableness" under prevailing professional norms.  See Strickland,

26  466 U.S. at 687-88.  The relevant inquiry is not what defense counsel could have done, but

27  rather whether the choices made by defense counsel were reasonable.  See Babbitt v.

28

1   <u>Calderon</u>, 151 F.3d 1170, 1173 (9th Cir. 1998).  Petitioner also must establish he was

2   prejudiced by his counsel's deficient performance; more particularly, petitioner must

3   demonstrate "there is a reasonable probability that, but for counsel's unprofessional errors,

4   the result of the proceeding would have been different."  <u>Strickland</u>, 466 U.S. at 694.  A

5   reasonable probability is a probability sufficient to undermine confidence in the outcome.  <u>Id.</u>

6       It is not necessary for a federal court considering on habeas review a claim of

7   ineffective assistance to address the prejudice prong of the <u>Strickland</u> test if the petitioner is

8   unable to establish incompetence under the first prong.  <u>See</u> <u>Siripongs v. Calderon</u>, 133 F.3d

9   732, 737 (9th Cir. 1998). Conversely, such court need not determine whether defense

10  counsel's performance was deficient before examining whether the petitioner suffered

11  prejudice as a result of the alleged deficiencies.  <u>Strickland</u>, 466 U.S. at 697.

12              a.    <u>Waiver of Preliminary Hearing</u>

13      Petitioner contends his attorney's decision to waive the preliminary hearing amounted

14  to ineffective assistance of counsel.  Counsel's decision was explored at length by the trial

15  court at the hearing on petitioner's <u>Marsden</u> motion on January 3, 2000.  <u>See</u> Resp. Ex. B,

16  Reporter's Transcript, ("RT") at 4-24.[2]  At that hearing, petitioner's counsel explained that the

17  waiver of the preliminary hearing was a tactical choice, stating: "[I]t's my experience in these

18  types of cases, especially when there are sex charges involved like here, . . . that sometimes

19  the preliminary hearing is really not a very good idea."  <u>Id.</u> at 11.  Counsel further stated that

20  he believed petitioner would be held to answer, that an "officer would probably just get on the

21  stand and give his version of the police report," and that the defense "ran a very high risk if

22  [it] allowed the police officer to get on and start embellishing the fact as [he had] seen them

23  do in the past . . . or if the victim gets on and starts embellishing a fact."  <u>Id.</u>  As counsel

24  further explained, if the preliminary hearing were to go forward and additional facts were

25  presented, petitioner faced the possibility of being charged with additional sex offenses.  <u>Id.</u> at

26  _____

27      [2]The proceedings reported at pages 4-24 of Exhibit B were conducted in camera and appear in
    a separate section of the record immediately following a section containing the proceedings reported at
28  pages 3 and 25-33.

1   11-12.  Counsel stated that after advising petitioner of his right to the hearing and of the

2   potential risks, petitioner agreed that waiving the preliminary hearing was a good idea.  Id. at

3   12.

4        The record indicates that counsel's waiver of the preliminary hearing was a tactical

5   decision.  Where, as here, the record contains indicia of tactical reflection by trial counsel, a

6   court must indulge a strong presumption that counsel's tactical decisions fell within the wide

7   range of reasonable professional assistance.  See Strickland, 466 U.S. at 689.  In this case,

8   trial counsel's testimony at the Marsden hearing reveals considerable tactical reflection with

9   respect to the decision to waive the preliminary hearing.  Petitioner has not offered any basis

10  for setting aside the strong presumption of reasonableness, nor does he dispute counsel's

11  statement that petitioner agreed with counsel's recommendation, at the time it was made, to

12  waive the preliminary hearing.  As a result, petitioner has failed to show his attorney's

13  decision to waive the hearing fell below an "objective standard of reasonableness" under

14  Strickland.  Accordingly, the state courts' denial of this claim was neither contrary to nor an

15  unreasonable application of clearly established federal law.

16           b.    Failure to File Motions for Discovery, to Suppress, and to Dismiss

17       Petitioner contends his attorney was ineffective because he did not file motions for

18  discovery, to suppress evidence, and to dismiss the two charges of which petitioner was

19  acquitted. Counsel's failure to file a motion does not amount to deficient performance if the

20  motion is without merit.  See Juan H. v. Allen, 408 F.3d 1262, 1273 (9th Cir. 2005).  In

21  addition, under Strickland, in order to show prejudice based on a failure to file a motion,

22  petitioner must show that had his counsel filed the motion, there is a reasonable probability

23  that (1) the trial court would have granted it as meritorious, and (2) had the motion been

24  granted, there would have been an outcome more favorable to him.  See Wilson v. Henry, 185

25  F.3d 986, 990 (9th Cir. 1999).

26       Petitioner has failed to show the above-referenced motions he wanted counsel to file

27  would have had any merit.  With respect to the motion for discovery, petitioner does not

28

8

allege what discovery counsel should have sought, what discoverable material was withheld, if any, by the prosecutor, or what discoverable material, if any, defense counsel failed to obtain by not filing the motion.  In the absence of any identification of such material, there is no basis for a finding that counsel should have filed the motion, or that if he had done so, the motion would have had any likelihood of success.  Similarly, with respect to the motion to suppress, petitioner does not specify what evidence counsel could have moved to suppress, nor does he offer any grounds upon which a motion to suppress could have been argued. Consequently, petitioner presents no grounds for a finding that counsel acted unreasonably in failing to file a motion for discovery or to suppress, much less any basis to conclude that either such motion, had it been filed, would have been meritorious or had any effect on the outcome of the trial.

As noted, petitioner also contends his attorney's failure to file a motion to dismiss the charges in Counts 1 and 4 amounted to ineffective assistance of counsel.[3]  The only basis petitioner offers for such claim is that the jury ultimately acquitted him of those charges.  The verdicts, however, indicate only that the jury found there was insufficient evidence to conclude beyond a reasonable doubt that petitioner was guilty.  Such a finding does not suggest the prosecutor had not met the significantly lower standard applicable for purposes of requiring petitioner to stand trial, specifically, probable cause to believe petitioner had committed the charged offenses.  That petitioner ultimately was acquitted of the charges thus does not establish counsel was ineffective in failing to move for their dismissal, and petitioner offers no other grounds counsel could have argued in a motion to dismiss.  As a result, petitioner has provided no support for a finding that his counsel's performance was deficient by reason of his failure to file a motion to dismiss, let alone any support for a finding that he was prejudiced thereby.

In sum, petitioner's claim of ineffective assistance of counsel fails because he has

---

[3]As discussed above, the two charges were, respectively, kidnapping to commit oral copulation (Cal. Penal Code § 209(b)(1)) and kidnapping during the commission of a carjacking (Cal. Penal Code § 209.5(a)).

1   failed to provide any grounds for overcoming the presumption of reasonableness in trial

2   counsel's tactical decision to waive the preliminary hearing, and he has failed to show that

3   motions for discovery, to suppress, or to dismiss the charges in Counts 1 and 4 would have

4   had any merit.  Accordingly, the  California Supreme Court's denial of this claim was neither

5   contrary to, nor an unreasonable application of, clearly established federal law.

6

7           2.      Unsubstantiated Charges

8           Petitioner contends the prosecutor violated his right to due process by bringing the

9   charges in Counts 1 and 4 while knowing such charges were "unsubstantiated."

10          As noted, a state prisoner, under section 2254(d)(1), may obtain habeas relief only if

11  the state court's decision was contrary to, or an unreasonable application of, "clearly

12  established Federal law, as determined by the Supreme Court of the United States."  Williams

13  v. Taylor, 529 U.S. at 402-04, 409.  If there is no Supreme Court precedent governing the

14  legal issue raised by petitioner, the state court's decision cannot be contrary to, or an

15  unreasonable application of, clearly-established federal law within the meaning of §

16  2254(d)(1).  Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).  Petitioner does not

17  cite, and this Court is not aware of, any Supreme Court precedent providing that a prosecutor

18  violates a defendants' constitutional rights by knowingly filing "unsubstantiated" charges.

19  Petitioner's reliance on  Napue v. Illinois, 360 U.S. 264 (1959), is misplaced.  In Napue, the

20  Supreme Court did not address the prosecution's decision to file charges, but rather the

21  prosecution's misconduct with respect to the knowing presentation of false evidence.  See id.

22  at 265 ("The question presented is whether . . . the failure of the prosecutor to correct the

23  testimony of the witness which he knew to be false denied petitioner due process of law in

24  violation of the Fourteenth Amendment to the United States Constitution.")  In short, in the

25  absence of any applicable Supreme Court precedent, the denial of petitioner's claim by the

26  California courts cannot be contrary to or an unreasonable application of "clearly established

27  federal law as determined by the Supreme Court of the United States" within the meaning of

28

10

1    28 U.S.C. § 2254(d)(1).  Consequently, there is no basis for habeas relief on this claim.

2          3.      Substitution of Counsel

3          Petitioner contends the trial court violated his constitutional rights by denying his

4    motion, made on the first day of trial, January 3, 2000,[4]  to appoint a new attorney for him

5    pursuant to People v. Marsden, 2 Cal. 3d 118 (1970).  Petitioner contends his motion to

6    substitute counsel should have been granted because his attorney had performed ineffectively

7    in waiving the preliminary hearing, and because the relationship between petitioner and

8    counsel had "deteriorated" during the course of pretrial preparations.  Petitioner's argument is

9    not persuasive.

10         First, with respect to counsel's decision to waive the preliminary hearing, petitioner,

11   for the reasons discussed above, has not shown such decision amounted to ineffective

12   assistance.  Consequently, the trial court's denial of petitioner's motion to substitute cannot

13   support a finding that petitioner was thereby denied his Sixth Amendment right to counsel.

14         With respect to the relationship between petitioner and defense counsel, the "ultimate

15   constitutional question" on habeas review is whether the trial court's denial of his request to

16   substitute counsel "actually violated [petitioner's] constitutional rights in that the conflict

17   between [petitioner] and his attorney had become so great that it resulted in a total lack of

18   communication or other significant impediment that resulted in turn in an attorney-client

19   relationship that fell short of that required by the Sixth Amendment."  See Schell v. Witek,

20   218 F.3d 1017, 1026 (9th Cir. 2000).  Put another way, to compel a criminal defendant to

21   undergo a trial assisted by an attorney with whom he has become embroiled in an

22   "irreconcilable conflict," is, in essence, to deprive the defendant of any counsel whatsoever.

23   See United States v. Moore, 159 F.3d 1154, 1159-60 (9th Cir. 1998).

24         Petitioner points to counsel's statements at the January 2000 Marsden hearing, wherein

25   counsel informed the trial court that his relationship with petitioner had deteriorated "to the

26   point of being irretrievable," that "there [was] no communication" between them, and that

27

28         [4] Petitioner makes no challenge to the trial court's denial in of his earlier-filed Marsden motion.

1    their visits had "turned out to be staring sessions or arguing sessions," wherein " nothing is

2    ever accomplished." RT at 15-16. Counsel consistently reiterated his belief, however, that he

3    could present a viable defense on petitioner's behalf if only petitioner would cooperate with

4    him, see, e.g., id. at 16, 23, and represented to the court that he could continue to represent

5    petitioner, see id. at 23. Thereafter, the trial court made the following findings with respect to

6    the relationship between petitioner and counsel:

7              I find any deterioration in the relationship has been occasioned solely by
         [petitioner's] willful recalcitrance or defiance and attitude. There's no reason
8        why in the future [petitioner] cannot be adequately represented by his attorney.
         I don't believe in [petitioner's] mind any attorney can satisfy [petitioner].
9              And I think [counsel] and the two private investigators that are here on
         this case have been and continue to do all they can. They've done quite a bit of
10       work on this case, and in my mind more than often what one sees.
               I think they've gone the extra yard for [petitioner]. And even with that
11       [petitioner] is not satisfied. That's something that I believe I need to take into
         consideration. I don't think anyone can satisfy [petitioner] in this regard. But I
12       believe, therefore, the Marsden motion shall be denied.

13   RT at 21-22. In denying the motion, the trial court again emphasized that it was "not finding

14   that there's been a breakdown such that [petitioner's] own cooperation cannot rectify it." Id.

15   at 24.

16           The trial court's factual determination that petitioner's own conduct, which could be

17   rectified with petitioner's cooperation, was the cause of the conflict between himself and

18   counsel, is presumed correct on habeas review. See 28 U.S.C. § 2254(e)(1). Petitioner here

19   offers nothing to overcome that presumption. Given the fact that any disruption of the

20   relationship between petitioner and defense counsel could have been corrected by the simple

21   expedient of petitioner's own cooperation, the dispute cannot be deemed "irreconcilable."

22   See, e.g., Schell v. Witek, 218 F.3d 1017, 1026 (9th Cir. 2000) (recognizing lack of Sixth

23   Amendment violation if "conflict was of [petitioner's] own making"); see also People v.

24   Michaels, 28 Cal.4th 486, 523 (2002) (noting a "[d]efendant cannot simply refuse to

25   cooperate with his appointed attorney and thereby compel the court to remove that attorney";

26   observing that "[i]f a defendant's claimed lack of trust in, or inability to get along with, an

27   appointed attorney were sufficient to compel appointment of substitute counsel, defendants

28

                                              12

1    effectively would have a veto power over any appointment") (internal quotation and citation

2    omitted).  Essentially, petitioner is not allowed to "sabotage" the relationship and than seek

3    relief therefor.  See Schell v. Witek, 218 F.3d at 1027.  Moreover, the trial court had counsel's

4    commitment as an officer of the court that he could continue to represent petitioner despite

5    any past difficulties.  Under the circumstances presented here, the record does not support a

6    finding of an "irreconcilable conflict" between petitioner and defense counsel; consequently,

7    the denial of petitioner's motion to substitute counsel did not amount to a denial of

8    petitioner's Sixth Amendment right to counsel.  Accordingly, the state courts' denial of

9    petitioner's claim based on such denial was neither contrary to nor an unreasonable

10   application of clearly established federal law.

11           4.      Denial of Self-Representation

12           Petitioner contends the trial court violated his Sixth Amendment right to represent

13   himself by denying his motion to proceed pro se.  Petitioner made the motion on the first day

14   of trial, immediately after the denial of the Marsden motion discussed above.  A criminal

15   defendant has a Sixth Amendment right to self-representation.  See Faretta v. California, 422

16   U.S. 806, 832 (1975).  A defendant's decision to represent himself and waive the right to

17   counsel must be unequivocal, knowing and intelligent, timely, and not for purposes of

18   securing delay.  See id. at 835.

19           During the hearing on petitioner's Faretta motion, the trial court explained the

20   difficulties of self-representation, which petitioner acknowledged without question, RT at 28-

21   29, until the trial court further informed petitioner that he would receive "no special liberty or

22   privileges nor a staff of investigators other than the potential of the private investigators [he]

23   presently ha[d]," id. at 29.  Petitioner then replied he did not understand that point and asked,

24   "Don't I get somebody to help me run through here? . . . To show me the ropes.  You know,

25   don't I get somebody to advise me – not like an attorney like him, but someone to be there,

26   somebody to help me out to run through this case?"  Id.  at 30.  Upon further inquiry by the

27   trial court, petitioner acknowledged that he was asking for advisory counsel who would, for

28

1   example, examine witnesses "as need be." Id. at 30-31.  The court then asked petitioner

2   whether petitioner's motion was, in essence, "a back door effort . . . to attempt to get a new

3   attorney," given that  his Marsden motion had just been denied.  Id. at 31.  Petitioner replied

4   that it was not, but that he believed he had a right to "get somebody to walk [him] through"

5   the trial.  Id.

6          After the above-described exchange, the trial court denied petitioner's motion to

7   represent himself, finding:  "[I]t's clear that [petitioner] has just lost his Marsden motion.  It is

8   clear that because he has lost his Marsden motion, he is now hoping to have an advisory

9   counsel represent him in the case to circumvent the Court's previous ruling.  This is nothing

10  more than an attempt to manipulate the Court."  Id.  The court further found: "[T]his [motion]

11  is untimely.  The cases are clear that Faretta motions on the day of trial are untimely.  There's

12  been no explanation to me why a Faretta motion has not been made prior to today's date."  Id.

13         The California Court of Appeal, citing Faretta, rejected petitioner's claim, holding the

14  trial court acted within its discretion when it denied petitioner's motion to proceed pro se.

15  Slip op. at 8.  The Court of Appeal, after first noting a defendant's federal constitutional right

16  to represent himself, further noted that petitioner had made his motion on the first day of trial.

17   Id.  As the Court of Appeal observed, the motion must be made within a reasonable time

18  before commencement of trial in order to be timely and that where a motion is untimely, it

19  may be denied in the trial court's discretion.  Id.  The Court of Appeal also cited the trial

20  court's determination that petitioner was attempting to obtain advisory counsel in

21  circumvention of its denial of the Marsden motion.  Id.

22         The decision of the Court of Appeal was neither contrary to, nor an unreasonable

23  application of, clearly established federal law.  The Ninth Circuit has held that the Supreme

24  Court has not clearly established when a Faretta request is untimely, and that other courts,

25  including state courts, are thus free to do so, as long as they comport with the Supreme

26  Court's holding that a request made "weeks before trial" is timely.  See Marshall v. Taylor,

27  395 F.3d 1058, 1061 (9th Cir. 2005) (holding California court did not act contrary to or

28

14

1   unreasonably apply clearly established Supreme Court law when it found <u>Faretta</u> request on

2   first day of trial, albeit before jury selection, untimely).  Here, the record reflects that

3   petitioner's motion, like the motion at issue in <u>Marshall</u>, was made on the first day of trial.

4   Consequently, the trial court's denial of the motion cannot be considered contrary to or an

5   unreasonable application of clearly established law within the meaning of § 2254(d)(1).

6   Moreover, in the instant case, additional grounds supported the trial court's denial,

7   specifically, that the motion was not made in good faith.  Accordingly, habeas relief is not

8   available based on the denial of petitioner's <u>Faretta</u> motion.

9         5.   <u>Instructions to Jury</u>

10        Petitioner contends the trial court violated his right to due process by refusing

11  instructions on lesser-included offenses requested by the defense and by giving, over

12  objection by the defense, instructions on lesser-included offenses requested by the

13  prosecution.  Petitioner also contends the trial court violated his right to due process by giving

14  confusing responses to the jury's questions about the charged offenses.

15        a.   <u>Lesser-Included Offenses</u>

16        Petitioner first asserts the trial court abused its discretion by refusing to instruct the

17  jury on lesser-included offenses requested by the defense.  The defense requested that the

18  court instruct the jury on simple battery and simple assault as lesser-included offenses of all

19  counts.  RT at 446.  The court denied this request, ruling there was no basis in the evidence

20  for the instruction.  <u>Id.</u>  The defense also requested that the court provide an instruction on car

21  theft as a lesser-included offense of carjacking.  <u>Id.</u> at 451.  The court denied this request as

22  well, reasoning that because carjacking can be committed without the theft of a car, car theft

23  is not a necessarily lesser-included offense of carjacking.  <u>Id.</u> at 450-52.  Petitioner contends

24  that the court's refusal to instruct on these lesser-included offenses violated his due process

25  rights.

26        The failure to instruct on a lesser-included offense in a capital case is constitutional

27  error if there was evidence to support the instruction.  <u>See</u> <u>Beck v. Alabama</u>, 447 U.S. 625,

28

638 (1980).  Although, in a non-capital case, a failure to instruct on a lesser-included offense does not present a federal constitutional claim, see Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000); Turner v. Marshall, 63 F.3d 807, 819 (9th Cir. 1995) (citing Bashor v. Riley, 730 F.2d 1228, 1240 (9th Cir. 1984), a "defendant's right to adequate jury instructions on his or her theory of the case" may "constitute an exception to the general rule," where substantial evidence to support such instruction appears in the trial record.  Solis, 219 F.3d at 929-30 (citing Bashor, 730 F.2d at 1240).

        Here, petitioner claims the trial court should have instructed the jury on simple assault and simple battery.  Even if the record contained sufficient evidence of one or both of those lesser offenses,[5] petitioner never presented either such offense to the jury as his theory of the case.  Rather, petitioner's sole defense was that the victim was lying about the nature of the encounter in its entirety, which theory is reflected in the record beginning with petitioner's opening statement, continuing throughout petitioner's examination of the witnesses, and concluding with closing argument on petitioner's behalf.  See, e.g., RT at 68:21-22 ("They are looking for drugs.  They are going to a party."), 498:18 ("Ramsey D is lying to you."), 508:17-18 ("Nothing in her story holds together other than the fact she lost her car.").  Consequently, instructions on battery and/or assault were not necessary to protect petitioner's right to jury instructions on his theory of the case.  As for the requested instruction on car theft, for the following reasons provided by the trial court, car theft is not a lesser-included offense of carjacking:

> [T]he owner of a car can commit a car jacking [sic] if the owner of the car takes his own car by force or fear from the possession of someone who is entitled to possess that car.
>     The owner of a car would be guilty of car jacking [sic], but he would not be guilty of [car theft] because a car jacking [sic] is defined as taking a car from someone who is in possession with the intent to . . . deprive the person in possession of the car of possession.  And [car theft] is defined in terms of taking or driving a car . . . without the consent of the owner, and with the intent to . . . deprive the owner of possession of the car. . . .  Therefore, it suggests to me that

---

[5] Battery is defined as "any willful and unlawful use of force or violence upon the person of another."  Cal. Penal Code § 242.  Assault is defined as "an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another."  Cal. Penal Code § 240.

16

1    [car theft] is not a lesser included offense.

2    RT at 450-51.  In any event, petitioner has not shown he was prejudiced by the absence of an

3    instruction on car theft.  As noted, petitioner's defense was that petitioner and Ramsey were

4    engaged in a mutual search for drugs and that none of the events as described by Ramsey

5    occurred other than his taking her car without her permission.  The jury, however, found

6    petitioner guilty of kidnapping and forcible oral copulation.  Ramsey testified petitioner took

7    her car after a violent struggle.  Under such circumstances, there is no reasonable probability

8    that the jury would have found petitioner guilty of car theft rather than carjacking.

9        Accordingly, the state courts' denial of petitioner's claim that his constitutional rights

10   were violated when the trial court refused his requested instructions on assault, battery and car

11   theft was neither contrary to nor an unreasonable application of clearly established federal

12   law.

13       Petitioner next contends the trial court violated his right to due process by instructing

14   the jury on lesser-included offenses requested by the prosecution.  The prosecution requested

15   that the court instruct the jury on simple kidnapping as a lesser-included offense of

16   kidnapping for the purpose of oral copulation (Count 1).  The prosecution also requested

17   instructions on simple kidnapping and carjacking as lesser-included offenses of kidnapping

18   during the commission of a carjacking (Count 4).  Id. at 442-45.  After finding these lesser-

19   included offenses were supported by the evidence, the trial court granted the prosecution's

20   request for instructions on them.  Id. at 442-43.[6]

21       Petitioner does not point to any Supreme Court authority, and this Court is not aware of

22   any, prohibiting the giving of lesser-included offenses where, as here, there was evidence

23

24       [6]The trial court also granted the prosecution's request for an instruction on a third lesser-
included offense, false imprisonment, as a lesser offense included in simple kidnapping, which in turn
25   was a lesser offense included in Counts 1 and 4.  Having convicted petitioner of both counts of simple
kidnapping, the jury did not convict petitioner of the lesser-included offenses of false imprisonment.
26   As petitioner was not convicted of false imprisonment, petitioner cannot claim he was prejudiced as a
result of the instructions on that offense.  See Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)
27   (holding habeas petitioner must show actual prejudice in order to obtain relief based on instructional
error).

28

                                        17

upon which the jury reasonably could find petitioner had committed those offenses beyond a reasonable doubt.  With respect to simple kidnapping,[7] Ramsey testified she felt compelled to drive petitioner where he wanted to go because she feared he would harm her, a fear the jury could conclude was reasonable given that she was alone with petitioner, a stranger, late at night with few people around, he was behaving erratically, and he became angry at her when he thought they were being followed.  Although Ramsey was driving, that movement, as she testified, was without her consent, in that she followed his commands, which were contrary to her request that she be allowed to drop him off and go home.  The movement was substantial in that they drove around the city, and it increased the risk of harm to Ramsey in that they arrived at a deserted cul-de-sac, which both decreased the likelihood of detection and Ramsey's ability to escape safely.  With respect to carjacking, Ramsey testified petitioner jumped on top of her when she attempted to escape, wrestled the keys away from her, and then got back into her car and drove away.  In light of the evidence from which the jury could find petitioner guilty of the lesser-included offenses of simple kidnapping and carjacking, the state courts' denial of petitioner's claim that instructions on these offenses violated his right to due process was neither contrary to nor an unreasonable application of clearly established federal law.

> b.   Jury Questions

Petitioner claims the trial judge provided inadequate and confusing answers to the following questions submitted by the jury during deliberations:

> (1) Why do we have Count 5, carjacking, as a separate count when it is included as a lesser crime in Count 4?
> (2) Would it be inconsistent for us to find guilty on Count 5 (carjack) &

---

[7]The trial court listed the elements of kidnapping as follows: "Number 1, a person who is compelled by another person to move because of a reasonable apprehension of harm.  Number 2, the movement of the other person was without her consent and number 3, the movement of the other person . . . in distance was substantial in character."  RT at 543.  The court explained that in determining whether the movement was substantial, the jury should consider "the totality of the circumstances" including, but not limited to, "the actual distance moved, whether the movement increased the risk of harm above that which existed prior to the movement; decreased the likelihood of detection, or increased the danger inherent in the victim's foreseeable attempt to escape and the attacker's enhanced opportunity to commit additional crimes."  Id. at 542.

1    not guilty to the lesser crime of carjacking in Count 4[?]
2        The same question applies to kidnapping which is a lesser, included
     crime in both Counts 1 & 4.

3    Resp.'s Ex. A, Clerk's Transcript, ("CT") at 77.

4        A trial judge has a duty to respond to the jury's request for clarification with sufficient

5    specificity to eliminate the jury's confusion.  See Beardslee v. Woodford, 358 F.3d 560, 574-

6    75 (9th Cir. 2004).  The trial judge has wide discretion, however, in charging the jury,

7    discretion that carries over to the judge's response to a question from the jury.  Arizona v.

8    Johnson, 351 F.3d 988, 994 (9th Cir. 2003).

9        In response to the first of the above-referenced questions, the trial judge stated:

10   Your first specific question is why do we have Count 5, car jacking as a separate
     count when it is included in a lesser crime in Count 4.  *Good question.  And the*
11   *answer is because – because you do.  Because the prosecutor filed the case that*
     *way.*
12       *There is [sic] isn't a reason for it that matters to you.  I tell you in*
     *general, the way the case is charged is up to the prosecutor.*  Sometimes – let's
13   take an imaginary crime that has ten lesser-included offenses.
         The prosecutor could file the greater crime as Count 1, the first lesser
14   Count 2, the second lesser, Count 3, and end up on a ten-count information
     based on one offense.  Or they can just file Count 1, and we tell you, "By the
15   way folks, there are nine lesser included offenses here."  Sometimes the lessers
     are set out as separate charges, sometimes they are not.  And for your purpose, it
16   doesn't matter because the rules remain the same.
         Here, you will see we have the charge of simple kidnapping in violation
17   of Section 207 pops up a couple of times as lessers.  It is never set out as a
     separate charge.  It could have been, but it isn't.  Doesn't matter.  236, false
18   imprisonment, pops up a couple times as a potential lesser charge.  It's never set
     out as a charged offense.  It doesn't matter.  It's just the way it is here.
19       And the fact that car jacking is set out as a separate count in Count 5 has
     no particular significance to you.  It just makes it a little trickier when you are
20   filling out the verdict forms as you seem to appreciate there is the potential for
     inconsistent findings.
21       So the answer to the first question is how come car jacking is a separate
     count?  The answer is, doesn't matter.
22
     RT at 579-80 (emphasis added).
23

24       Petitioner contends the highlighted language in the above answer "mislead the jurors

25   by misstating the charges," specifically, by stating the prosecutor, in Counts 4 and 5, had

26   charged petitioner with carjacking.  The trial court did not in fact tell the jury, either in the

27   above-highlighted language cited by petitioner or anywhere else, that the prosecutor had filed

28   two counts of carjacking.  Rather, the trial court correctly told the jury there was one charged

                                            19

count of carjacking in Count 5, and that carjacking was also "included" as a "lesser crime" in Count 4.  In telling the jury the prosecutor filed the case "that way," and in providing an example of an offense containing multiple lesser-included offenses, the trial court simply clarified the prosecution's charging options, one such option being to charge each lesser offense in a separate count and the other being to charge only the greater offense, with instructions given thereafter on any lesser-included offenses.

Petitioner further contends the trial court's telling the jury that "it doesn't matter" is the equivalent of telling the jury to "disregard the facts and evidence of the trial and to reach a verdict based upon something other than the facts and evidence at the trial."  Again, petitioner's argument is not persuasive.  The jury's question indicated the jury was concerned as to whether there were two different offenses of carjacking.  By explaining the prosecutor's options as to the way a charge is put before a jury, and further explaining that for the jury's purposes "it doesn't matter," because "the rules remain the same," the trial court reasonably informed the jury that they need not be concerned as to the form of the charges and need only decide whether the prosecution had proved beyond a reasonable doubt that petitioner had committed the particular offense.  There is  no reasonable way in which the jurors could have interpreted such answer to mean they should "disregard the facts and evidence" presented to them.

As to the jury's second question, the trial court answered as follows:

Number two, you asked, would it be inconsistent for you[,]us[,] to find guilty on Count 5, car jack [sic] and not guilty to the lesser crime of car jack [sic] in Count 4.  The short answer to that is yes, it would be inconsistent.

I'm going to be rather technical about this.  When you are saying "find the defendant guilty," it's not clear to me whether you're talking about finding him – let me start at that over again.

You need to understand that any time you convict someone of a crime that has lesser included crimes within it, you are automatically convicting him of every lesser crime.  If – I will use Count 1 as an example.  Kidnapping for the specific purpose of oral copulation includes within it simple kidnapping and false imprisonment.

So, even though you wouldn't fill out this lesser verdict form, if you find a defendant guilty of kidnapping for the purpose of oral copulation, you are necessarily[,] automatically finding him guilty of those lesser offenses.

And since simple kidnapping is a lesser offense, any time that you see a 207, a simple kidnapping, elsewhere in the scheme of things, you already

20

1  decided he's guilty of at least a simple kidnapping because you found that he is
   not only guilty of simple kidnapping, but of kidnapping for some specific
2  purpose.
        Back to the specific question [which] was, "Would it be consistent [sic]
3  to find guilty on car jacking [sic] under Count 5 and not guilty on the lesser?"
   Yes.  That would be inconsistent.  If he's guilty of car jacking [sic], he's guilty
4  of car jacking [sic].  It would not be inconsistent for you to find out – start using
   kidnapping as an example.
5        It is certainly not inconsistent to find a defendant not guilty of one of
   these special kinds of kidnapping, kidnapping for the purpose of oral copulation
6  or kidnapping during a car jack [sic], and then go ahead and then find him guilty
   of simple kidnapping.
7        That wouldn't be inconsistent because the jury could say yes, I think this
   is a simple kidnapping, I just don't think it is a kidnapping with the specific
8  intent to commit the other crime.  So that would not be inconsistent.
        You then go on to say you have the same question that applies to
9  kidnapping which is a lesser included crime in both Counts 1 and 4.  Would it
   be inconsistent to find him guilty in one lesser and not guilty in the other?  And
10 I guess that by that you mean in the other lesser.  And yes, that would be
   inconsistent.
11       As I said a moment ago, if a defendant is guilty of one of these offenses
   he's guilty of it, and wherever that pops up, he would be guilty of that offense.
12       Using kidnapping as an example though, keep in mind just because
   someone might be found guilty of a simple kidnapping does not necessarily
13 follow that he's guilty of kidnapping for some special purpose.
        And as between the Count 1 and Count 4, the fact that someone might be
14 guilty of a kidnapping during a car jacking, special kind of kidnapping, does not
   necessarily follow that he's automatically guilty of kidnapping for some other
15 special purpose such [as] kidnapping for oral copulation.

16 Id. at 580-82.

17       Petitioner does not contend the trial court gave an erroneous answer in advising the

18 jury it would be inconsistent to reach different verdicts on the two carjacking charges or to

19 reach different verdicts on the two simple kidnapping charges.  Rather, he argues that the

20 answer directed the jury to reach guilty verdicts on those charges.  Petitioner asserts that

21 "[b]ased on the contents of the question, the jury shows that it was in favor of a not guilty

22 decision on the lesser on count 4, carjacking," but that the court directed the jury to reach a

23 guilty verdict when "the court told them . . . 'if he's guilty of carjacking, he's guilty of

24 carjacking.'"   Petitioner's argument is based on a misreading of the record.

25       First, the jury never stated it was "in favor" of acquittal on the lesser-included

26 carjacking in Count 4, any more than it indicated it was "in favor of" a guilty verdict on Count

27 5.  The jury merely gave an example of possible inconsistent verdicts.  Second, in stating, "if

28

1    he's guilty of carjacking, he's guilty of carjacking," the trial court was simply tracking the

2    jury's example.  Although, ideally, the trial court could have followed up with the converse

3    example, "if he's not guilty of carjacking, he's not guilty of carjacking," the only reasonable

4    interpretation of the answer he gave, particularly in light of all the other instructions, is that

5    the jury's verdicts on identical charges must be the same.

6         Petitioner similarly contends that the trial court's answer improperly told the jury

7    "petitioner is guilty of carjacking as well as of kidnapping wherever those charges pop up."

8    In that regard, petitioner cites to the portion of the answer wherein the trial court stated:  "And

9    yes that would be inconsistent.  As I said a moment a go, if a defendant is guilty of one of

10   these offenses, he's guilty of it, and wherever that pops up, he would be guilty of that

11   offense."  This statement did not tell the jurors that petitioner is guilty of any offense, but only

12   that "as [the trial court] said a moment ago," where the same offense is charged more than

13   once, their verdicts on those charges must be the same.  Petitioner further argues that this

14   portion of the court's answer would lead the jury to find petitioner guilty of any offense in

15   which the *word* "kidnapping" or "carjacking" appears.  The trial court's answer, however,

16   speaks in terms of "offenses," not words; consequently, the use of the phrase "wherever that

17   pops up" can only be reasonably understood as reiterating the trial court's prior admonition

18   with respect to consistency of verdicts where the same offense is charged more than once.

19        In sum, although not a model instruction, the trial court's answer to the jury's questions

20   did not improperly inform the jury of the charged offenses, instruct them to disregard the

21   evidence presented, or direct a guilty verdict.  As a result, the state courts' denial of this claim

22   was neither contrary to nor an unreasonable application of clearly established federal law.

23        6.    Insufficiency of Evidence

24        Petitioner contends the jury improperly found him guilty of forcible oral copulation

25   because no evidence of force was introduced.  The Due Process Clause "protects the accused

26   against conviction except upon proof beyond a reasonable doubt of every fact necessary to

27   constitute the crime with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  A

28

1  state prisoner who alleges that the evidence in support of his state conviction cannot fairly be

2  characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable

3  doubt therefore states a constitutional claim, see <u>Jackson v. Virginia</u>, 443 U.S. 307, 321

4  (1979), which, if proven, entitles him to federal habeas relief, see <u>id.</u> at 324.

5          A federal court reviewing collaterally a state court conviction does not determine

6  whether that court itself is satisfied that the evidence established guilt beyond a reasonable

7  doubt.  <u>Payne v. Borg</u>, 982 F.2d 335, 338 (9th Cir. 1992).  Rather, the federal court

8  "determines only whether, 'after viewing the evidence in the light most favorable to the

9  prosecution, any rational trier of fact could have found the essential elements of the crime

10  beyond a reasonable doubt.'"  <u>See id.</u> (quoting <u>Jackson</u>, 443 U.S. at 319).  Only if no rational

11  trier of fact could have found proof of guilt beyond a reasonable doubt, may the writ be

12  granted.  <u>See</u> <u>Jackson</u>, 443 U.S. at 324.

13          Here, with respect to the elements of forcible oral copulation, the trial court instructed

14  the jury that a person commits that offense if such person "participate[s] in an act of oral

15  copulation with an alleged victim" and if "the act was accomplished against the alleged

16  victim's will by means of duress, menace or fear of immediate or unlawful bodily injury on

17  the alleged victim."  <u>See</u> CT at 191; <u>see also</u> CALJIC 10.10; Cal. Penal Code

18  § 288a(c)(2).  In defining "duress," the court instructed the jury that "[d]uress means a direct

19  or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable

20  person of ordinary susceptibilities to perform an act which otherwise would not have been

21  performed, or acquiesce in an act to which one otherwise would not have submitted."  CT at

22  192.  The jurors were further instructed that "[t]he total circumstances, including the age of

23  the victim, and her relationship to the defendant, are factors to consider in appraising the

24  existence of duress."  <u>Id.</u>  The court defined "menace" as "any threat, declaration, or act which

25  shows an intention to inflict an injury upon another."  <u>Id.</u> at 193.

26          Petitioner claims there was insufficient evidence of force because Ramsey testified that

27  petitioner did not "threaten her" or use physical force to get her to orally copulate him.  RT at

28

335.  Under California law, as the trial court explained to the jury, oral copulation is forcible if it is accomplished by the use of "duress, menace or fear of immediate or unlawful bodily injury."  "Duress," in turn, includes an "implied" threat , and "menace" includes any "act" that "shows an intention to inflict an injury upon another."  Consequently, under the instructions given with respect to forcible oral copulation, which instructions petitioner does not challenge, the jury was not required to find petitioner either expressly "threatened" Ramsey or used actual physical force upon her person.

Given the instructions and Ramsey's testimony, as described in detail above, there was sufficient evidence to establish that the act was accomplished against Ramsey's will by means of duress, menace or fear of immediate or unlawful bodily injury.  In brief, prior to the acts of oral copulation, petitioner, who was a stranger to Ramsey, obtained entry into her car late at night under the false pretense of needing help and then refused to leave, all the while behaving erratically and in an a paranoid manner and ultimately wrestling her car keys away from her to prevent her from leaving a deserted area to which he had directed her to drive; when he commanded her to orally copulate him, she clearly expressed her lack of willingness to do so and grabbed her car keys in an effort to drive away, at which point petitioner became "really angry" and reiterated his demands, to which she then acceded.  Under such circumstances, the state courts' denial of petitioner's claim of insufficient evidence was not contrary to, or an unreasonable application of, clearly established federal law, and petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

In light of the foregoing, the petition for a writ of habeas corpus is DENIED.

The Clerk shall close the file.

IT IS SO ORDERED.

DATED: September 6, 2006

MAXINE M. CHESNEY
United States District Judge

24